01

02

03

04

05

06

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

07   CALVIN JONES,                          )
                                           )
08        Petitioner,                      )   CASE NO. 2:06-cv-00775-RSL-JLW
                                           )
09        v.                               )
                                           )
10   TOM L. CAREY, Warden,                 )   REPORT AND RECOMMENDATION
                                           )
11        Respondent.                      )
     _____)

12

13        I.        SUMMARY

14             Petitioner Calvin Jones is currently incarcerated at the California State Prison, Solano

15   in Vacaville, California.  He was convicted by a jury of first-degree murder in Placer County

16   Superior Court in 1973, and sentenced to seven-years-to-life with the possibility of parole.

17   He has filed a petition for writ of habeas corpus, together with relevant portions of the state

18   court record, under 28 U.S.C. § 2254 challenging his 2005 denial of parole by the Board of

19   Parole Hearings of the State of California (the "Board").[1]  (*See* Docket 1 at 1-24.)  Respondent

20   has filed an answer to the petition, and petitioner has filed a traverse in reply to the answer.

21   (*See* Dkt. 9; Dkt. 10.)  The briefing is now complete and this matter is ripe for review.  The

22

---

[1]  The Board of Parole Hearings replaced the Board of Prison Terms, which was abolished on July 1, 2005.  *See* California Penal Code § 5075(a).

REPORT AND RECOMMENDATION -1

01 Court, having thoroughly reviewed the record and briefing of the parties, recommends the

02 Court deny the petition, and dismiss this action with prejudice.

03       II.   BACKGROUND

04       The Life Prisoner Evaluation Report relied upon by the Board during the 2005 parole

05 hearing set forth the following relevant facts:

06              "In 1969, Calvin Jones and Rosalio Estrada were co-owners of
               Port City Liquors in Stockton, California.  During 1970, Jones
07             and his partner (Estrada) decided to venture into the
               construction business and took a third partner, Anthony C.
08             Virgilio (the victim) to form the Port City Construction
               Company.  The construction company was suffering financially.
09             On December 31, 1973, at approximately 7 p.m., the Stockton
               Police found the victim lying in the street on the 400 block of
10             North Sutter Street, near his automobile, suffering from
               multiple gunshot wounds to the arm, leg, chest, and abdomen,
11             coupled with lacerations to the face.  The victim, prior to death,
               informed authorities that Calvin Jones and Rosalio Estrada were
12             responsible for the shooting; however, he stated neither had
               actually shot him.  According to the victim, he had arrived for a
13             meeting with Calvin Jones at 920 North Hunter Street, but was
               accosted by another man who shot him.  Anthony C. Virgilio
14             died at St. Joseph's Hospital at 9:15 p.m. on December 31,
               1973.

15             Per the Probation Officer's Report (POR), autopsy revealed the
16             victim had been shot at least six times from a .38 caliber
               handgun.  Furthermore, it was learned Jones and Estrada had
17             secured a $100,000 life insurance policy on the victim, shortly
               before the murder.  Jones was not arrested for this offense until
18             April 3, 1980.  On June 28, 1983, Jones was found guilty by
               jury trial of Section 187, California Penal Code, First-Degree
19             Murder.  The case was heard in Placer County as a result of a
               change of venue from San Joaquin County.  Charges against
20             Rosalio Estrada were dismissed by the San Joaquin County
               District Attorney's Office."

21

22 (*See* Docket 9, Exhibit D at 1.)


REPORT AND RECOMMENDATION -2

01          As discussed above, although the commitment offense occurred on December 31,

02   1973, petitioner was not convicted by a jury of first-degree murder in Placer County Superior

03   Court until 1983.  (*See id*. at 2.)  Petitioner was sentenced to seven-years-to-life with the

04   possibility of parole, and his minimum eligible parole date was set for January 20, 1989.  (*See*

05   Dkt. 1, Ex. A at 1.)  The parole denial which is the subject of this petition took place after a

06   parole hearing held on August 1, 2005.  This was petitioner's seventh subsequent and eighth

07   overall parole consideration hearing, and his application for parole was denied for three years.

08   (*See id*. at 21 and 39.)  As of the date of the 2005 parole hearing, petitioner was approximately

09   sixty-one-years-old, and had been in custody for twenty-two years.  (*See id*. at 25.)

10          After denial of his 2005 application, petitioner filed habeas corpus petitions in the

11   Placer County Superior Court, California Court of Appeal, and California Supreme Court.

12   (*See* Dkt. 9, Exs. E, F, and G.)  Those petitions were unsuccessful.  (*See id*.)  This federal

13   habeas petition followed.  Petitioner contends his 2005 denial by the Board violated his Fifth

14   and Fourteenth Amendment Due Process rights, as well as his Eighth Amendment right to be

15   free from cruel and unusual punishment.  Thus, petitioner does not challenge the validity of

16   his conviction, but instead challenges the Board's 2005 decision finding him unsuitable for

17   parole.

18          III.    STANDARD OF REVIEW

19          The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this

20   petition because it was filed after the enactment of AEDPA.  *See Lindh v. Murphy*, 521 U.S.

21   320, 326-27 (1997).  Because petitioner is in custody of the California Department of

22   Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive

     vehicle for his habeas petition.  *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir.), *cert*.

REPORT AND RECOMMENDATION -3

01  *denied*, 543 U.S. 991 (2004) (providing that § 2254 is "the exclusive vehicle for a habeas

02  petition by a state prisoner in custody pursuant to a state court judgment, even when the

03  petitioner is not challenging his underlying state court conviction.").  Under AEDPA, a

04  habeas petition may not be granted with respect to any claim adjudicated on the merits in state

05  court unless petitioner demonstrates that the highest state court decision rejecting his petition

06  was either "contrary to, or involved an unreasonable application of, clearly established

07  Federal law, as determined by the Supreme Court of the United States," or "was based on an

08  unreasonable determination of the facts in light of the evidence presented in the State court

09  proceeding."  28 U.S.C. § 2254(d)(1) and (2).

10      As a threshold matter, this Court must ascertain whether relevant federal law was

11  "clearly established" at the time of the state court's decision.  To make this determination, the

12  Court may only consider the holdings, as opposed to dicta, of the United States Supreme

13  Court.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In this context, Ninth Circuit

14  precedent remains persuasive but not binding authority.  *See id.* at 412-13; *Clark v. Murphy*,

15   331 F.3d 1062, 1069 (9th Cir. 2003).

16      The Court must then determine whether the state court's decision was "contrary to, or

17  involved an unreasonable application of, clearly established Federal law."  *See Lockyer v.*

18  *Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

19  grant the writ if the state court arrives at a conclusion opposite to that reached by [the

20  Supreme] Court on a question of law or if the state court decides a case differently than [the]

21  Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

22  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

    state court identifies the correct governing legal principle from [the] Court's decisions but

REPORT AND RECOMMENDATION -4

01  unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  At all

02  times, a federal habeas court must keep in mind that it "may not issue the writ simply because

03  [it] concludes in its independent judgment that the relevant state-court decision applied clearly

04  established federal law erroneously or incorrectly.  Rather that application must also be

05  [objectively] unreasonable." *Id.* at 411.

06      In each case, the petitioner has the burden of establishing that the state court decision

07  was contrary to, or involved an unreasonable application of, clearly established federal law.

08  *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).  To determine

09  whether the petitioner has met this burden, a federal habeas court looks to the last reasoned

10  state court decision because subsequent unexplained orders upholding that judgment are

11  presumed to rest upon the same ground.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04

12  (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).

13      Finally, AEDPA requires federal courts to give considerable deference to state court

14  decisions, and state courts' factual findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

15  Federal courts are also bound by a state's interpretation of its own laws.  *See Murtishaw v.

16  Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme,* 998 F.2d 710, 713

17  (9th Cir. 1993)).

18      IV.    FEDERAL HABEAS CHALLENGES TO STATE PAROLE DENIALS

19          A.    *Due Process Right to be Released on Parole*

20      Under the Fifth and Fourteenth Amendments to the United States Constitution, the

21  government is prohibited from depriving an inmate of life, liberty or property without the due

22  process of law.  U.S. Const. amends. V, XIV.  A prisoner's due process claim must be

    analyzed in two steps: the first asks whether the state has interfered with a constitutionally

REPORT AND RECOMMENDATION -5

01 protected liberty or property interest of the prisoner, and the second asks whether the

02 procedures accompanying that interference were constitutionally sufficient. *Ky. Dep't of*

03 *Corrs. v. Thompson*, 490 U.S. 454, 460 (1989); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d

04 1123, 1127 (9th Cir. 2006).

05        Accordingly, our first inquiry is whether petitioner has a constitutionally protected

06 liberty interest in parole.  The Supreme Court articulated the governing rule in this area in

07 *Greenholtz v. Inmates of Neb. Penal,* 442 U.S. 1 (1979), and *Board of Pardons v. Allen,* 482

08 U.S. 369 (1987).  *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (applying

09 "the 'clearly established' framework of *Greenholtz* and *Allen"* to California's parole scheme).

10 The Court in *Greenholtz* determined that although there is no constitutional right to be

11 conditionally released on parole, if a state's statutory scheme employs mandatory language

12 that creates a presumption that parole release will be granted if certain designated findings are

13 made, the statute gives rise to a constitutional liberty interest. *See Greenholtz*, 442 U.S. at 7,

14 12; *Allen*, 482 U.S. at 377-78.

15        As discussed *infra*, California statutes and regulations afford a prisoner serving an

16 indeterminate life sentence an expectation of parole unless, in the judgment of the parole

17 authority, he "will pose an unreasonable risk of danger to society if released from prison."

18 Title 15 Cal. Code Regs., § 2402(a).  The Ninth Circuit has therefore held that "California's

19 parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillion*,

20 306 F.3d at 902.  To similar effect,  *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) held

21 that California Penal Code § 3041 vests all "prisoners whose sentences provide for the

22 possibility of parole with a constitutionally protected liberty interest in the receipt of a parole

release date, a liberty interest that is protected by the procedural safeguards of the Due

REPORT AND RECOMMENDATION -6

01  Process Clause."  This "liberty interest is created, not upon the grant of a parole date, but

02  upon the incarceration of the inmate."  *Biggs v. Terhune*, 334 F.3d 910, 915 (2003).  *See also*

03  *Sass*, 461 F.3d at 1127.

04          Because the Board's denial of parole interfered with petitioner's constitutionally-

05  protected liberty interest, this Court must proceed to the second step in the procedural due

06  process analysis and determine whether the procedures accompanying that interference were

07  constitutionally sufficient.  "[T]he Supreme Court [has] clearly established that a parole

08  board's decision deprives a prisoner of due process with respect to this interest if the board's

09  decision is not supported by 'some evidence in the record.'"  *Irons*, 505 F.3d at 851 (citing

10  *Superintendent v. Hill*, 472 U.S. 445, 457 (1985) (holding the "some evidence" standard

11  applies in prison disciplinary proceedings)).  The "some evidence" standard requires this

12  Court to determine "whether there is any evidence in the record that could support the

13  conclusion reached by the disciplinary board."  *Hill*, 472 U.S. at 455-56.  Although *Hill*

14  involved the accumulation of good time credits rather than release on parole, later cases have

15  held that the same constitutional principles apply in the parole context because both situations

16  directly affect the duration of the prison term.  *See e.g., Jancsek v. Or. Bd. of Parole*, 833 F.2d

17  1389, 1390 (9th Cir. 1987) (adopting the "some evidence" standard set forth by the Supreme

18  Court in *Hill* in the parole context); *accord*, *Sass*, 461 F.3d at 1128-29); *Biggs*, 334 F.3d at

19  915; *McQuillion*, 306 F.3d at 904.

20          "The fundamental fairness guaranteed by the Due Process Clause does not require

21  courts to set aside decisions of prison administrators that have some basis in fact," however.

22  *Hill*, 472 U.S. at 456.  Similarly, the "some evidence" standard is not an invitation to examine

the entire record, independently assess witnesses' credibility, or re-weigh the evidence.  *Id.* at

REPORT AND RECOMMENDATION -7

01  455.  Instead, it is there to ensure that an inmate's loss of parole was not arbitrarily imposed.

02  *See id.* at 454.  The Court in *Hill* added an exclamation point to the limited scope of federal

03  habeas review when it upheld the finding of the prison administrators despite the Court's

04  characterization of the supporting evidence as "meager."  *See id.* at 457.

05          B.      *California's Statutory and Regulatory Scheme*

06          In order to determine whether "some evidence" supported the Board's decision with

07  respect to petitioner, this Court must consider the California statutes and regulations that

08  govern the Board's decision-making.  *See Biggs*, 334 F.3d at 915.  Under California law, the

09  Board is authorized to set release dates and grant parole for inmates with indeterminate

10  sentences.  *See* Cal. Penal Code § 3040 and 5075, *et seq.*  Section 3041(a) requires the Board

11  to meet with each inmate one year before the expiration of his minimum sentence and

12  normally set a release date in a manner that will provide uniform terms for offenses of similar

13  gravity and magnitude with respect to their threat to the public, as well as comply with

14  applicable sentencing rules.  Subsection (b) of this section requires that the Board set a release

15  date "unless it determines that the gravity of current convicted offense or offenses, or the

16  timing and gravity of current or past convicted offense or offenses, is such that consideration

17  of the public safety requires a more lengthy period of incarceration."  *Id.*, § 3041(b).  Pursuant

18  to the mandate of § 3041(a), the Board must "establish criteria for the setting of parole release

19  dates" which take into account the number of victims of the offense as well as other factors in

20  mitigation or aggravation of the crime.  The Board has therefore promulgated regulations

21  setting forth the guidelines it must follow when determining parole suitability.  *See* 15 CCR

22  § 2402, *et seq.*

REPORT AND RECOMMENDATION -8

01          Accordingly, the Board is guided by the following regulations in making a

02   determination whether a prisoner is suitable for parole:

03               (a) General. The panel shall first determine whether the life
                 prisoner is suitable for release on parole. Regardless of the
04               length of time served, a life prisoner shall be found unsuitable
                 for and denied parole if in the judgment of the panel the
05               prisoner will pose an unreasonable risk of danger to society if
                 released from prison.
06
                 (b) Information Considered. All relevant, reliable information
07               available to the panel shall be considered in determining
                 suitability for parole. Such information shall include the
08               circumstances of the prisoner's social history; past and present
                 mental state; past criminal history, including involvement in
09               other criminal misconduct which is reliably documented; the
                 base and other commitment offenses, including behavior before,
10               during and after the crime; past and present attitude toward the
                 crime; any conditions of treatment or control, including the use
11               of special conditions under which the prisoner may safely be
                 released to the community; and any other information which
12               bears on the prisoner's suitability for release. Circumstances
                 which taken alone may not firmly establish unsuitability for
13               parole may contribute to a pattern which results in a finding of
                 unsuitability.
14
     15 CCR § 2402(a) and (b).  Subsections (c) and (d) also set forth suitability and unsuitability
15
     factors to further assist the Board in analyzing whether an inmate should be granted parole,
16
     although "the importance attached to any circumstance or combination of circumstances in a
17
     particular case is left to the judgment of the panel." 15 CCR § 2402(c).
18
               In examining its own statutory and regulatory framework, the California Supreme
19
     Court in *In re Lawrence* recently held that the proper inquiry for a reviewing court is
20
     "whether some evidence supports the *decision* of the Board … that the inmate constitutes a
21
     current threat to public safety, and not merely whether some evidence confirms the existence
22
     of certain factual findings."  *In re Lawrence*, 44 Cal.4th 1181, 1212 (2008).  The court also

     REPORT AND RECOMMENDATION -9

01  asserted that the Board's decision must demonstrate "an individualized consideration of the

02  specified criteria, but "[i]t is not the existence or nonexistence of suitability or unsuitability

03  factors that forms the crux of the parole decision; the significant circumstance is how those

04  factors interrelate to support a conclusion of current dangerousness to the public." *Id*. at

05  1204-05, 1212.  As long as the evidence underlying the Board's decision has "some indicia of

06  reliability," parole has not been arbitrarily denied.  *See Jancsek*, 833 F.2d at 1390.  As the

07  California courts have continually noted, the Board's discretion in parole release matters is

08  very broad.  *See Lawrence*, 44 Cal.4th at 1204.  Thus, the penal code, corresponding

09  regulations, and California law clearly establish that the fundamental consideration in parole

10  decisions is public safety and an assessment of a prisoner's current dangerousness.  *See id.*, at

11  1205-06.

12      C.      *Summary of Governing Principles*

13          By virtue of California law, petitioner has a constitutional liberty interest in release on

14  parole.  The parole authorities may decline to set a parole date only upon a finding that

15  petitioner's release would present an unreasonable present risk of danger to society if he is

16  released from prison.  Where the parole authorities deny release, based upon an adverse

17  finding on that issue, the role of a federal habeas court is narrowly limited.  It must deny relief

18  if there is "some evidence" in the record to support the parole authority's finding of present

19  dangerousness.  The penal code, corresponding regulations, and California law clearly support

20  the foregoing interpretation.

21      V.      PARTIES' CONTENTIONS

22          Petitioner contends that the Board violated his state and federal due process rights by

finding him unsuitable for parole without any evidence that he poses an unreasonable risk of

01 danger to society if released from prison.[2]  (*See* Dkt. 1 at 5.)  In addition, petitioner argues the

02 Board failed to consider or give appropriate weight to evidence suggesting that petitioner was

03 suitable for parole.  (*See id*. at 4-7.)  He also claims that the Board improperly considered

04 views expressed by the San Joaquin District Attorney, including a letter alleging "elements

05 that [were] not proven by a jury [at the] trial."  (*Id*. at 20-21.)  Finally, petitioner contends that

06 the Board "has failed to 'reset' petitioner's term … as an indeterminate sentence prisoner

07 (ISL) whose crime was committed before July 1, 1977," and that his indeterminate life

08 sentence constitutes cruel and unusual punishment because it is disproportionate to his crime.

09 (*Id*. at 9-20.)

10         Respondent claims that petitioner does not have a constitutionally protected liberty

11 interest in being released on parole, that the "some evidence" standard is inapplicable in this

12 context, and that even if he does have a protected liberty interest, the Board adequately

13 predicated its denial of parole on "some evidence."  (*See* Dkt. 9 at 6-9.)  Accordingly,

14 respondent argues that petitioner's due process rights were not violated by the Board's 2005

15 decision, and the Placer County Superior Court's Order upholding the Board's 2005 parole

16 denial was not an unreasonable application of clearly established federal law.  (*See id.* at 7-9.)

17         VI.      ANALYSIS OF RECORD IN THIS CASE

18         A.      *State Court Proceedings*

19         After the Placer County Superior Court denied his habeas petition, petitioner filed

20 habeas petitions in the California Court of Appeal and California Supreme Court.  (*See id*.,

21 Exs. E-G.)  Both petitions were summarily denied.  (*See id*. at F and G.)  Respondent admits

22

---

[2] We do not reach petitioner's claim that his state due process rights were violated, as state claims are not cognizable in a federal habeas petition. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (asserting that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

REPORT AND RECOMMENDATION -11

01  that petitioner's habeas petition was timely, and petitioner properly exhausted each of his

02  claims before the California Supreme Court.  (*See id*. at 3.)  This Court reviews the Placer

03  County Superior Court's Order upholding the Board's decision to determine whether it meets

04  the deferential AEDPA standards, as it is the last reasoned state court decision.  *See Ylst*, 501

05  U.S. at 803-04.

06        B.     *Petitioner's Due Process Claim*

07        The Board based its decision that petitioner was unsuitable for parole primarily upon

08  his commitment offense, but also cited petitioner's pattern of criminality, insufficient

09  psychological evaluation, and opposition from the San Joaquin District Attorney.  (*See* Dkt. 1,

10  Ex. A at 35-40.)  The Board's findings tracked the applicable unsuitability and suitability

11  factors listed in § 2402(b), (c) and (d) of title 15 of the California Code of Regulations.  After

12  considering all reliable evidence in the record, the Board concluded that evidence of

13  petitioner's positive behavior in prison did not outweigh evidence of his unsuitability for

14  parole.  (*See id*. at 35.)

15        1.     *Petitioner's Commitment Offense*

16        The Board primarily relied upon the circumstances of the commitment offense to find

17  petitioner unsuitable for parole.  (*See id*. at 35-36.)  Petitioner hired a "hit man" to murder the

18  victim in order to collect proceeds from a life insurance policy he had taken out without the

19  victim's knowledge.  The panel explained that petitioner has "taken a position that [he] did

20  not do it, but as [the Board] indicated all along, we have to take the position that [petitioner]

21  did.  That's what the record indicates and that's what we have to go on…."  (*Id*. at 35.)

22        After reviewing the facts of the crime, the Board concluded the offense was "carried

    out in [an especially] cruel and callous manner.  [It was also] carried out in a dispassionate

REPORT AND RECOMMENDATION -12

01   and calculated manner, such as an execution style murder." (*Id.*)  *See* 15 CCR § 2402(c)(1)(B)

02   and (D).  In addition, the Board found "[t]he motive for the crime [to be] inexplicable or very

03   trivial in relation to the offense…."  (Dkt. 1, Ex. A at 35-36.)  *See* 15 CCR § 2402(c)(1)(E).

04   Specifically, petitioner was motivated by the possibility of financial gain, because after

05   petitioner "hired or engaged somebody else to do the killing, [he] later went back [and

06   attempted] to collect on the life insurance policy" for approximately ten years following the

07   victim's death.  (Dkt. 1, Ex. A at 36.)  The Board concluded that "the aggravated nature of

08   [petitioner's] offense and the circumstances [in] which [petitioner] committed [it] caused us

09   great concern."  (*Id.*)  Thus, the facts of petitioner's commitment offense, a premeditated

10   murder carried out by a hired killer for financial gain, provide "some evidence" to support the

11   Board's conclusion that petitioner would pose an unreasonable risk of danger to society or

12   threat to public safety if released from prison.  (*Id.* at 35.)

13          2.     *Petitioner's Pattern of Criminality*

14          The Board also relied upon petitioner's lengthy pattern of criminality to find him

15   unsuitable for parole.  In order to make a suitability determination, the Board is required to

16   consider "[a]ll relevant, reliable information available to the panel ... including [a prisoner's]

17   past criminal history, [such as] involvement in other criminal misconduct which is reliability

18   documented, [and] behavior before, during and after [the base and other commitment

19   offenses]...."  15 CCR § 2402(b).

20          In its decision, the Board pointed out that after the victim's death, petitioner tried to

21   recover the insurance proceeds "for some close to ten years after the incident.  And during

22   that period of time, [he was] not free from other involvement in criminal activity as indicated

     by [petitioner's] arrest for arson, arrest for insufficient funds, and both of those were

REPORT AND RECOMMENDATION -13

01    ultimately dismissed, but they involved, again, criminal activity looking towards gaining

02    money and by other means."  (Dkt. 1, Ex. A at 36-37.)  In addition, petitioner was "convicted

03    of violations of federal narcotics laws [for] the sale of cocaine, an economic crime, and

04    sentenced to three years in federal prison.  [He was also charged with] assault with a deadly

05    weapon during the time that [he was] out on appeal bond from [the narcotics] conviction."

06    (*Id*. at 37.)  Although petitioner's narcotics charge was ultimately dismissed as a result of the

07    instant murder conviction, the Board noted that this dismissal "should not be considered as

08    being indicative of the lack of the liability of that offense."  (*Id*.)  Finally, the Board

09    considered petitioner's institutional history, including his most recent disciplinary violation

10    for conspiracy to introduce a controlled substance into the prison, which the Board noted

11    "indicates a pattern of criminality exceeding 20 years.  That pattern of behavior [caused the

12    Board] great concern and ultimately resulted in termination of suitability."  (*Id*. at 37.)  Thus,

13    petitioner's pattern of criminality, including illegal conduct committed after the instant

14    offense but prior to his conviction, provides "some evidence" to support the Board's

15    conclusion that petitioner would pose an unreasonable risk of danger to society or threat to

16    public safety if released from prison.

17            3.      *Petitioner's Insufficient Psychological Evaluation*

18            The Board also considered petitioner's insufficient psychological evaluation during

19    the hearing.  The applicable regulations require the Board to consider a prisoner's "past and

20    present mental state" and "past and present attitude toward the crime…."  *See* 15 CCR

21    § 2402(b).  With respect to petitioner's October 17, 2002, psychological report prepared by

22    Dr. VanCourving, which assessed petitioner's "present risk of danger to the community" as

       low, the Board found that it "can't give [the psychologist's assessment] that much credence

REPORT AND RECOMMENDATION -14

01  because there are [problematic] factors that she relies upon … [For example,] she assumes

02  [petitioner's] version of what occurred."  (Dkt. 1, Ex. A at 38.)  The Board also observed that

03  the report is "either inaccurate or she has a lack of information to assess factors … [a]nd it's

04  interesting to note [given petitioner's] history of narcotics traffic[king], the indication [in the

05  report] somehow that [petitioner does] not have a narcotics problem.  So, we discount the

06  nature of the report although it's favorable…."  (*Id.*)  After reviewing the psychological

07  report, this Court finds "some evidence" in the record to support the Board's finding that the

08  psychological report, although positive, does not provide "relevant, reliable" evidence of

09  petitioner's suitability for parole.

10           4.     *Opposition by the District Attorney*

11           Petitioner contends that the Board erred by expressly considering a letter from the San

12  Joaquin District Attorney dated July 16, 2005, which opposed petitioner's release on parole.

13  (*See* Dkt. 1 at 19-20; *id.*, Ex. A at 38.)  In the letter, the District Attorney summarized the

14  offense, and argued that petitioner should be found unsuitable for parole because, among

15  other reasons, he "has failed to upgrade vocationally, [as his] last documented vocational

16  program was drafting in 1985."  (*Id.*, Ex. A at 20.)  The District Attorney also asserted that

17  until petitioner "accepts responsibility for the death of [the victim], upgrades vocationally,

18  and shows proof of employment opportunities, it is the opinion of our office that parole

19  [should] be denied…."  (*Id.*)

20           In addition to his argument regarding the January 2005 letter, petitioner asserts that the

21  Board improperly considered another letter dated January 31, 2000, which was submitted by

22  the District Attorney at a prior hearing.  (*See* Dkt. 1 at 20-21; *id.*, Ex. D.)  Specifically,

    petitioner claims the January 2000 letter, which explained the reason for the delay of

REPORT AND RECOMMENDATION -15

01 approximately ten years before petitioner was arrested for his crime, alleged "elements that

02 [were] not proven by a jury [at the] trial."  (*Id*. at 20-21.)  Petitioner contends that due to the

03 Board's consideration of the District Attorney's unsubstantiated allegations, "[an] evidentiary

04 hearing must be Ordered [to] afford to Petitioner his constitutional rights under the Fifth,

05 Sixth, and Fourteenth Amendment to have a jury trial on all issues raised by the

06 Prosecution…."  (*See id*. at 22.)

07          Petitioner's arguments regarding the July 2005 letter are unavailing.  In making its

08 suitability determination, the Board must "take into account all pertinent information and

09 input about the particular case from the inmate's victims, the officials familiar with his or her

10 criminal background, and other members of the public who have an interest in the grant or

11 denial of parole to this prisoner."  *In re Dannenberg,* 34 Cal.4th 1061, 1086 (2005).

12 California law provides that a prosecutor may represent "the interests of the people" at a

13 parole hearing, and may "comment on the facts of the case and present an opinion about the

14 appropriate disposition."  *See* Cal. Penal Code § 3041.7; 15 CCR § 2030.  *See also*

15 *Rosenkrantz v. Marshall,* 444 F. Supp. 2d 1063, 1080 n.14 (C.D. Cal. 2006) (noting that in the

16 absence of other reliable evidence of unsuitability in the record, opposition by law

17 enforcement based upon the nature of the commitment offense does not constitute "some

18 evidence" to support parole denial).  Because the Board did not solely rely upon the District

19 Attorney's statements to find petitioner unsuitable for parole, but also considered other

20 reliable evidence of unsuitability, its consideration of the District Attorney's July 2005 letter

21 during its analysis was not arbitrary and capricious.

22          Although the Board did not expressly discuss the District Attorney's January 2000

letter during the hearing, this Court can reasonably assume that the Board reviewed the letter

REPORT AND RECOMMENDATION -16

01  as part of petitioner's central file at the institution.  California law does not require the Board

02  to limit its consideration to information "proven" at trial, as petitioner claims.  Rather, the

03  regulations require the Board to consider "[a]ll relevant, reliable information available to the

04  panel" in order to determine whether, "in the judgment of the panel [a] prisoner will pose an

05  unreasonable risk of danger to society if released from prison."  *See* 15 CCR § 2402(a) and

06  (b).  Petitioner fails to provide any evidence demonstrating that the information contained in

07  the District Attorney's January 2000 letter constitutes "unreliable" information.

08          Finally, regardless of whether the Board's consideration of the District Attorney's

09  January 2000 letter constituted an error under California law, it cannot serve as a basis for

10  federal habeas relief.  As discussed above, the Board's parole denial does not violate due

11  process unless there is no reliable evidence in the record which could support its finding that

12  the petitioner presents an unreasonable risk to society.  Although the January 2000 letter

13  contained additional factual information regarding petitioner's offense which was unfavorable

14  to him, the facts upon which the Board relied were also supported elsewhere in the record.

15  (*See* Dkt. 1, Ex. D at 1-2.)  As discussed below, there was sufficient evidence in the record to

16  deny parole without any consideration of the District Attorney's allegations.  Accordingly,

17  petitioner is not entitled to an evidentiary hearing, or habeas relief, based upon this claim.

18          4.      *Petitioner was Afforded Due Process of Law*

19          Contrary to petitioner's argument that the Board failed to consider or give appropriate

20  weight to the parole suitability rules which favored petitioner, the Board noted that

21  petitioner's "institutional record is fine.  [Petitioner has] done well in here.  [He has] broken

22  no law, other than as indicated.  Apparently now, not a disciplinary problem, and [he is]

commended for those activities."  (*Id.*, Ex. A at 37-38.)  Despite the San Joaquin District

REPORT AND RECOMMENDATION -17

01   Attorney's arguments to the contrary, the Board also found that petitioner's "parole plans, as

02   indicated at this stage, seem to be viable.  We understand that it's hard to assess what you

03   might do with respect to your disability until that disability is fully assessed by

04   (indiscernable).  As it is, [petitioner seems] to have made [reasonable] plans should [he] be

05   released." (*Id*. at 38-39.)  It is therefore an inaccurate characterization of the record to say

06   that the Board failed to provide petitioner with an individualized consideration of all relevant

07   factors, including factors which favored petitioner.  (*See* Dkt. 1 at 4-7.)

08          As mentioned above, however, the Board has broad discretion to determine how

09   suitability and unsuitability factors interrelate to support its conclusion of current

10   dangerousness to the public.  *See Lawrence*, 44 Cal.4th at 1212.  Despite petitioner's recent

11   gains, the Board asserted that "given the nature of [his] offense and the longevity of it …

12   [petitioner needs to] demonstrate a continued period of crime free behavior within the

13   institution to assure society that the egregious commitment offense and [petitioner's other]

14   criminal history" will not be repeated upon his release.  (Dkt. 1, Ex. A at 39.)  It also ordered

15   a new psychological evaluation to be completed before petitioner's next parole hearing.  (*See*

16   *id*. at 40.)  Thus, the Board's finding that petitioner would pose an unreasonable risk of danger

17   to society or threat to public safety if released on parole within the following three years was

18   reasonable, and supported by "some evidence" in the record.  (*See id*. at 39 and 35.)

19          C.     *Petitioner's Eighth Amendment Claim*

20          Petitioner contends that the Board violated his constitutional rights, including his

21   right to be free from cruel and unusual punishment under the Eighth Amendment, by failing

22   "to 'reset' petitioner's term … as an indeterminate sentence prisoner (ISL) whose crime was

committed before July 1, 1977…." (Dkt. 1 at 9.)  Because petitioner committed his first-

REPORT AND RECOMMENDATION -18

01   degree murder offense in 1973, when the ISL was still in effect, he received an indeterminate

02   sentence of seven-years-to-life when he was convicted and sentenced in 1983.  (*See* Dkt. 1 at

03   2; *id.*, Ex. E at 1.)  Here, petitioner specifically challenges the Board's failure to fix a definite

04   term of "no more than 25 years … [because] there is no such thing as a life maximum for

05   those who are serving a [term of] life with the possibility of parole…." (*Id.* at 14.)  As

06   support for his assertions, petitioner cites the California Supreme Court decision *In re*

07   *Rodriguez*, which held that a prisoner whose maximum term was disproportionate to his

08   individual culpability had a right to a proportionate sentence to avoid the imposition of cruel

09   and unusual punishment.  (*See id.* at 12.)  *See also In re Rodriguez,* 14 Cal.3d 639, 651-52

10   (1975).  As explained below, petitioner's arguments are based upon a misunderstanding of

11   California's repealed ISL and relevant case law, and are therefore without merit.

12        Under the ISL, which was California's pre-1977 sentencing regime, "almost all

13   convicted felons received indeterminate terms, often with short minimums and life

14   maximums.  Within this broad range, the parole authority was given virtually unbridled

15   statutory power to 'determine and redetermine, after the actual commencement of the

16   imprisonment, what length of time, if any, such person shall be imprisoned,'" and when to

17   allow those prisoners to be released on parole.  *Dannenberg*, 34 Cal.4th at 1088.  The ISL did

18   not require the parole authority to fix prisoners' terms at anything less than the statutory

19   maximum.  *See* Cal. Penal Code § 3041.

20        The unbridled discretion afforded to the parole authority by the ISL attracted criticism

21   by reformers, and would eventually lead to the enactment of the Determinate Sentencing Law

22   ("DSL") in 1977.  While the ISL was still in effect, however, "[c]ontemporaneous court

decisions and administrative developments, addressing problems in the indeterminate

01  sentencing law," attempted to respond to some of these criticisms.  *Dannenberg*, 34 Cal.4th at

02  1089.   For example, petitioner cites the Chairman's Directive 75/20, which was issued by the

03  parole authority in April 1975.  (*See* Dkt. 1 at 12.)  Directive 75/20 "creat[ed] a structure for

04  setting parole dates based on listed ranges and factors.  Following this directive, numerous

05  hearings were conducted to abolish the [parole authority's] practice of deferring a decision on

06  parole and to establish fixed parole dates for almost all inmates [under the ISL]."

07  *Dannenberg*, 34 Cal.4th at 1089.  *See also In re Stanley*, 54 Cal.App.3d 1030, *3 (1975)

08  (providing that Directive 75/20 "establishes [for each prisoner] a base offense … [and] then

09  directs selection of either a typical or aggravated range for the base offense.").  The California

10  Court of Appeal later invalidated Directive 75/20, however, because it failed to base

11  prisoners' parole release dates upon all factors relevant to their suitability for parole, such as

12  post-conviction behavior.  *See Stanley*, 54 Cal.App.3d at *8-9.

13          In 1975 the California Supreme Court held that depending upon the particular

14  circumstances of the offense, a life-maximum sentence may be so grossly disproportionate to

15  the crime, such as assault with force likely to produce great bodily injury (under former Cal.

16  Penal Code § 245(a)), as to constitute cruel or unusual punishment under the Eighth

17  Amendment.  *People v. Wingo*, 14 Cal.3d 169, 175-180 (1975).  Specifically, the *Wingo* court

18  held that if an actual release date has been set by the Board, the proportionality of an

19  indeterminate sentence should be measured by that date.  *See id*. at 183.  The Supreme Court

20  recognized that term-setting by the Board was not mandatory, however, when it provided that

21  "[i]f the [parole authority], either by omission or by the exercise of its discretion, fails or

22  declines within a reasonable time to set a term, the particular conduct will be measured

    against the statutory maximum [for the offense]."  *Id.* at 184.

REPORT AND RECOMMENDATION -20

01         The case cited by petitioner, *In re Rodriguez*, was issued only two months after *Wingo*

02 and expanded upon the parole authority's term-fixing responsibilities under the ISL.  In that

03 case, the California Supreme Court found that an inmate who had received the statutory

04 sentence of one-year-to-life for a single incident of lewd and lascivious conduct upon a child

05 under the age of fourteen had received a constitutionally disproportionate sentence for his

06 crime. *Rodriguez*, 14 Cal.3d at 644; *Dannenberg*, 24 Cal.4th at 1089.  The *Rodriguez* court

07 then found that, as applied to that particular prisoner, the twenty-two years already served in

08 prison was excessive, and constituted cruel and unusual punishment. *Rodriguez,* 14 Cal.3d at

09 653-54.  In addition, the *Rodriguez* court reasoned that the ISL must be construed as requiring

10 the parole authority to set actual maximum terms for all inmates that are proportionate to their

11 culpability, a duty derived from former § 3020, which is distinct from the parole authority's

12 power under § 3040 to decide if and when the prisoner is ready for parole. *Id*. at 652.

13         Thus, *Wingo* and *Rodriguez* established that the Board should set a term of years for

14 ISL prisoners, which is presumed to be the statutory maximum of the prisoners' sentence if no

15 other term has been set by the Board.  In petitioner's case, no term of years beyond his

16 indeterminate sentence of seven-years-to-life has been explicitly set by the Board.  As a

17 result, this Court presumes that petitioner's term is the statutory maximum, life imprisonment,

18 for his first-degree murder offense.

19         To the extent that petitioner's argument that his life sentence is unconstitutionally

20 disproportionate is based upon state law, his claim is not cognizable in this Court. *See Estelle*

21 *v. McGuire*, 502 U.S. 62, 67-68 (1991).  Furthermore, to the extent that petitioner's claim is

22 based upon federal law, it is also unavailing.  The United States Supreme Court has held that a

life sentence is constitutional, even for a non-violent property crime. *See Rummel v. Estelle*,

REPORT AND RECOMMENDATION -21

01 445 U.S. 263, 274 (1980) (upholding a life sentence with the possibility of parole, imposed

02 under a Texas recidivist statute, for a defendant convicted of obtaining $120.75 by false

03 pretenses, an offense normally punishable by imprisonment for two to ten years); *Harmelin v.*

04 *Michigan*, 501 U.S. 957, 962-64 (1990) (upholding a sentence of life without the possibility

05 of parole for a defendant convicted of possessing more than 650 grams of cocaine, although it

06 was his first felony offense).  Accordingly, a life sentence for a first-degree murder such as

07 that committed by petitioner would not constitute cruel and unusual punishment under the

08 Eighth Amendment to the U.S. Constitution.  *See Banks v. Kramer*, 2009 WL 256449 (E.D.

09 Cal. 2009) (unpublished) (holding that a Board's refusal to release a prisoner who was

10 sentenced to sixteen years-to-life for murder does not constitute cruel and unusual

11 punishment).  The Board's parole denial, and failure to "fix" the duration of petitioner's

12 sentence, did not violate his constitutional rights.

13       D.     *Placer County Superior Court Decision*

14       The Placer County Superior Court's summation of the Board's findings during the

15 2005 hearing contained several inaccuracies.  (*See* Dkt. 9, Ex. E at 2.)  For example, the

16 superior court erroneously stated that the Board found "Petitioner shot his business partner six

17 times," and petitioner's "counselor found petitioner to be 'an unpredictable degree of threat to

18 the public' if released."  (*Id*.)  The Board actually found that petitioner was convicted of first-

19 degree murder for hiring another person to shoot the victim on his behalf, and that petitioner's

20 October 17, 2002, psychologist's report assessed petitioner's "present risk of danger to the

21 community" as low.  (*See* Dkt. 1, Ex. A at 7-8, 35-36, and 38.)

22       The fact that petitioner hired someone else to commit a murder, however, does not

diminish petitioner's commitment offense as a factor tending to indicate unsuitability for

REPORT AND RECOMMENDATION -22

01  parole.  Furthermore, the Board ultimately discounted "the nature of the [psychological]

02  report although it's favorable" to petitioner because, among other reasons, the psychologist

03  apparently assumed petitioner's version of the crime.  (*Id*. at 38.)  Thus, despite the

04  inaccuracies in the Placer County Superior Court's summation, this Court finds that the

05  superior court correctly concluded that there was "some evidence" in the record to support the

06  Board's parole denial.

07       VII.    CONCLUSION

08       As stated above, it is beyond the authority of a federal habeas court to determine

09  whether evidence of suitability outweighs the circumstances of the commitment offense,

10  together with any other reliable evidence of unsuitability for parole.  The Board has broad

11  discretion to determine how suitability and unsuitability factors interrelate to support its

12  conclusion of current dangerousness to the public.  *See Lawrence*, 44 Cal.4th at 1212.

13  Although the Board praised petitioner's recent progress in prison, it determined that petitioner

14  remains unpredictable, and therefore an unreasonable risk of danger to society if released.

15  Because the state court decision upholding the Board's findings satisfies the "some evidence"

16  standard, there is no need to reach respondent's argument that another standard applies.

17       Given the totality of the Board's findings, there is "some evidence" that as of August

18  1, 2005, the date of the parole decision challenged in this case, petitioner's release on parole

19  would have posed an unreasonable risk of danger to society or threat to public safety if

20  released from prison.  The Placer County Superior Court's Order upholding the Board's

21  decision was not contrary to, or an unreasonable application of, clearly established federal

22  law, or based on an unreasonable determination of facts.  I therefore recommend that the

Court find that petitioner's due process rights were not violated, and that it deny his petition

REPORT AND RECOMMENDATION -23

01   and dismiss this action with prejudice.

02          This Report and Recommendation is submitted to the United States District Judge

03   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days

04   after being served with this Report and Recommendation, any party may file written

05   objections with this Court and serve a copy on all parties.  Such a document should be

06   captioned "Objections to Magistrate Judge's Report and Recommendation."  Failure to file

07   objections within the specified time may waive the right to appeal the District Court's Order.

08   *See Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  A proposed order accompanies this

09   Report and Recommendation.

10          DATED this 30th day of September, 2009.

11

12

13   JOHN L. WEINBERG
     United States Magistrate Judge

14

15

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION -24